[No. 27799.   Department Two.   August 19, 1940.]

PRENTICE PACKING AND STORAGE COMPANY, *Respondent*,
v. UNITED PACIFIC INSURANCE COMPANY,
*Appellant*.[1]

[1]Reported in 106 P. (2d) 314.

*Bruce Bartley* and *Harry L. Olson,* for appellant.

*Rigg, Brown & Halverson* and *Paul M. Goode,* for respondent.

STEINERT, J.—Plaintiff brought suit upon a policy of insurance issued by defendant and sought in its complaint to recover damages for loss sustained as the result of the bursting of an ammonia pipe in one of the rooms of plaintiff's cold storage plant wherein a quantity of packed fruit had been assembled. In a trial before a jury, a verdict was returned for plaintiff, and from a judgment thereon, defendant has appealed.

Respondent is a fruit packing and storing corporation, operating a cold storage plant and refrigerating system at Westbrook, near Yakima, Washington. Appellant is engaged in the insurance business, with offices in Seattle.

On September 24, 1938, appellant issued to respondent a policy of insurance, by the terms of which appellant undertook to insure respondent against loss from accident as defined in the policy. The term "accident" was defined as

" . . . a sudden and accidental tearing asunder of the object [refrigerating system] or any part thereof caused by *pressure of the refrigerant* or brine therein, but leakage at valves, fittings, joints or connections shall not constitute an accident." (Italics ours.)

Ammonia was the refrigerant used by respondent in its refrigerating system.

The policy specifically limited the insurance to loss from accident as therein designated; it did not include accidents caused by other forces, whether operating within or without the refrigerating system. This distinction goes to the root of the present controversy and gives rise to the first, or basic, issue between the parties. Respondent contends that the bursting of the pipe was caused by pressure of the refrigerant, while appellant's contention is that it was not so caused, or, at least, that respondent failed to establish such cause or any cause for which appellant can be held liable.

With reference to the types of property insured, the pertinent provisions of the policy obligated appellant

"(SECTION I) To Pay the Assured for loss on the property *of the Assured* directly damaged by such accident. . . ."

and

"(SECTION III) To Pay . . . such amounts as the Assured *shall become obligated to pay by reason of the liability of the Assured for loss on the property of others* directly damaged by such accident, including liability for loss of use of such damaged property of others; . . ." (Italics ours.)

Section III of the policy as just quoted forms the basis of the second issue between the parties, namely, whether or not, in any event, appellant is liable for loss of fruit stored in respondent's warehouse, but owned by persons other than the warehouseman.

The facts with reference to the construction and arrangement of respondent's refrigerating system are practically without dispute, and we shall therefore to a large extent avail ourselves of the descriptive matter contained in the briefs.

Respondent's refrigeration machine was of the usual reciprocating type, run by electric motors, which com-

pressed the gaseous ammonia, forcing it into tanks and receivers, where, by virtue of pressure of about 150 pounds per square inch, it became liquid and gave off considerable heat. This portion of the system, where the gas is compressed, is commonly referred to as the "high side," because in that side of the system, between the compressors and the expansion valve, the gas is compressed, and, prior to the time that it is allowed to expand, the pressure, in terms of pounds per square inch, is higher than that in the expansion area. From the high side of the system, the ammonia enters the expansion valve, where it is allowed to expand and proceed through a pipeline into the coils. In the process of expansion, the gas takes up heat and thereby cools the coils. Thus, after passing the expansion valve, the pressure is reduced from 150 pounds per square inch to between 25 and 35 pounds per square inch, and that side of the system is therefore known as the "low pressure side."

In respondent's plant, the pipeline between the expansion valve and the cooling coils was a one-half inch heavy steel pipe which came vertically out of the expansion valve on the east wall of the cold storage room, proceeded southerly, nearly parallel to the ceiling, for a distance of about sixteen feet, and then executed a right angle turn and proceeded westerly about twenty-two inches, where it was threaded into a flange. In the latter area, the pipeline was suspended by metal hangers about fourteen inches below the ceiling. The opposite end of the flange was threaded onto a two-inch pipe which comprised a part of the cooling coil. The flange formed the connecting and reducing point between the one-half inch feeder pipe leading from the expansion valve and the two-inch pipe comprising the cooling apparatus. The flange was drawn together by means of four bolts, with a

gasket in between to prevent leakage at the connection. According to the evidence in the case, standard heavy one-half inch steel pipe has a tested pressure of 700 pounds per square inch, a working pressure of from 1,298 to 1,750 pounds per square inch, and a bursting pressure of approximately 14,000 pounds per square inch.

The break, or rupture, over which this controversy arose, occurred in the first or second thread of the one-half inch pipe, just at the outside edge of the flange. The break was across the top, and extended from thirty to forty per cent of the way around the circumference, of the pipe, and its width was estimated to be from 1/32 to 1/4 of an inch. The lower two-thirds of the pipe was not broken.

In the storage room containing the equipment just described, there had been placed several thousand boxes of apples and pears, arranged in tiers of varying heights. Some of the tiers were six boxes high; others attained a height of thirteen boxes. These boxes had been stacked underneath, and around, the cooling coils.

On October 8, 1938, one Leland Wilson, an employee of respondent, was engaged with other employees in stacking boxes of fruit in the storage room. Wilson was standing on a six-box tier of apples, approximately seven feet below the ceiling, and about six feet below, or away, from the half-inch pipeline where it entered the flange. Another employee was operating a small truck on the floor a short distance from where Wilson stood. At the time immediately preceding the accident, Wilson was engaged in placing sheets of heavy paper between the coils and the fruit to protect the fruit against freezing.

Whether or not Wilson came in contact with, or exerted any force upon, the pipe at, or immediately prior

to, the time of the break, is in dispute, and that dispute presents one of the factual issues in this case.

In a deposition, taken by appellant shortly before the trial and when Wilson was no longer in the employ of respondent, Wilson testified that he had stumbled and fallen against the pipe. On the other hand, respondent's witnesses testified that, in prior conversations with both his employer and an agent of appellant, Wilson had stated positively that he had not come in contact with the pipe. In addition to that evidence, respondent introduced at the trial a letter which it had written to Wilson, prior to the taking of his deposition, as follows:

"Mr. Leland Wilson,                           November 16, 1938
Buhl, Idaho
Dear Sir:

"With reference to the accident which took place at our Westbrook warehouse on October 8th at about 5:40 p. m., the insurance company claims that someone must have bumped or hit the ammonia pipe that blew out at that time.

"Will you please send us a written statement stating just what you were doing, and what took place at the time this pipe blew out.

"We of course are aware that you have told not only ourselves, but also the representative of the insurance company that you did not hit or bump the ammonia coils in any way. But if this goes to a court action, it will be of great value to us if you will state in writing that you did not hit the coils or bump them in any manner.                                   Yours truly,
PRENTICE PACKING & STORAGE CO.
By E. S. Prentice"

On the back of that letter, Wilson wrote the following reply, which was also introduced in evidence:

"Gentlemen:

"I was working in the packing house up close to the place the pipe broke. I was putting paper up around

the fruit to keep it from freezing. I never hit it or bumped it any way.                              Leland Wilson"

None of Wilson's fellow-employees was actually watching Wilson at the time of the occurrence, but each of them testified that he did not see or hear anyone or anything fall against the pipe.

In any event, while Wilson was working in the vicinity of the half-inch feeder line, a break occurred in the threads of the pipe at the point where it fitted into the flange. The refrigerant, ammonia, gushed out of the conduit, making a noise that was variously described as something like the blow-out of an automobile tire and like the sound of steam escaping from a train starting out on a frosty morning. Wilson, who became enveloped in a cloud of ammonia, jumped from his position on the tier of boxes and fell onto the loaded truck below; immediately thereafter, he and the operator of the truck made their way out of the storage room. The escape of the ammonia resulted in serious damage to the stored fruit, a part of which was owned by respondent and the rest by various growers. For the entire loss thus sustained, respondent instituted this action.

■ Before proceeding to a discussion of the case on its merits, we shall dispose of respondent's motion to strike the statement of facts. Respondent predicated its motion on the grounds that the entire statement of facts, containing all the evidence produced at the trial, is not before this court; that the entire statement of facts has not been certified and filed in accordance with the rules of this court; that it appears from the certificate of the trial judge, attached to the statement of facts, and from an examination of the statement, that the deposition of Leland Wilson introduced in evidence at the trial is not a part of the record herein; and that upon an examination of the

record by respondent's counsel on February 6, 1940, it appeared that the deposition of Leland Wilson "is not a part of the record on file in the clerk's office in [this] court." The absence from the record of the Wilson deposition was the sole basis for each of the above-mentioned grounds.

It is conceded by respondent's counsel that appellant filed its statement of facts in the superior court within the prescribed ninety-day period, and that the statement included not only the oral testimony in the case but also the deposition of Leland Wilson. While the deposition was not physically attached to the statement of facts, the trial court's certification of the statement expressly states:

" . . . that the deposition of Leland Wilson, read at said trial, is hereby made a part of said statement as though fully set forth herein."

It is apparent from what has been said above, and from the showing made by respondent, that the clerk of the superior court, in transmitting the statement of facts to this court, failed to send therewith the Wilson deposition, and that the deposition did not arrive here until February 8, 1940, two days after the argument on appeal.

Respondent insists that it was incumbent upon appellant to see that "the entire record was before the supreme court at the time the case came on for hearing and was submitted to the court for its determination." Respondent further insists that, since the deposition was not on file in this court on the day of hearing the appeal, the *entire* record was not properly before us, and that consequently the motion to strike the statement of facts should be granted. Reliance is placed on Rules VIII and IX of the Rules of the Supreme Court, 193 Wash. 7-a to 11-a.

Rule VIII, relating to transcripts on appeal, imposes upon the *clerk of the superior court* the duty of transmitting to this court such transcript, accompanied by, and as part of the record, any bill of exceptions or statement of facts then on file. The rule further provides:

"In case any bill of exceptions or statement of facts shall be filed or certified, or any other *addition to the records* or files shall be made, after the record on appeal shall have been sent up, a supplementary record on appeal, embracing so much thereof as the appellant deems material, or a copy thereof, may be prepared, certified, and sent up *at any time prior to the hearing of the appeal.*" (Italics ours.)

Emphasizing the words "prior to the hearing of the appeal," respondent contends that no deficiency in the record may be cured subsequent to that time. The provision of Rule VIII quoted above, however, has no application to the case at bar, for the simple reason that nothing was here *added* to the record. See *State v. Schafer,* 154 Wash. 322, 329, 282 Pac. 55, 58. The deposition was made a part of the record, as certified by the trial court, and remained in the custody of the clerk of the superior court from the time that it was published, during the course of the trial, until it was transmitted by him to this court.

Rule IX requires that

"A proposed bill of exceptions or statement of facts must be served and filed in the office of the *clerk of the superior court* within ninety days after the date of entry of the final judgment, . . ." (Italics ours.)

Appellant complied with that requirement. The rule does not require the appellant to assume the duty of forwarding the statement of facts to this court. That duty properly rests upon the clerk of the superior court. We see no reason for penalizing the appellant for any delay on the part of that official, unless, of course, the

appellant is in some manner at fault, which does not appear to be the fact in this case.

The case at bar is to be distinguished from cases such as *State ex rel. Van Name v. Board of Directors,* 14 Wash. 222, 44 Pac. 270, and *Kane v. Kane,* 35 Wash. 517, 77 Pac. 842, wherein essential portions of the statements of facts at no time reached this court. Cases wherein supplemental statements of facts were proposed *after* the expiration of the ninety-day period provided therefor by the rules of court are likewise inapposite.

Appellant complied with the jurisdictional requirements, and the appeal was decided on the basis of a complete record. Respondent's motion to strike the statement of facts is therefore denied.

Upon the merits of the controversy, the determinative issue is whether or not there was sufficient evidence to take the case to the jury upon respondent's claim that the break in the pipe was caused by pressure of the refrigerant.

In dealing with that issue, we shall first consider certain contentions made by appellant, which, though strongly and extensively urged, do not, in our opinion, exactly present the decisive question in the case. It will therefore be understood that, in passing upon those contentions, we reserve for later consideration the main and decisive question as stated in the preceding paragraph.

Appellant's contentions are: (1) that the proof conclusively showed that the break was caused by Wilson stumbling against, or in some way striking, the pipe, and that, since the result was thus produced by an external force, and not by pressure, the coverage provisions of the policy do not apply; and (2) that, since respondent elected to prove its case by circumstantial evidence, it was incumbent upon it to exclude,

by a preponderance of the evidence, certain probable causes of the event for which appellant would not be liable, and that respondent failed to sustain that burden.

With reference to the first contention, it may be conceded that the circumstances under which the particular accident occurred might naturally lead one to suspect that it was caused by the application of some external force upon the pipe, and there is no question but that the accident could have happened in that way. It is also true that there was ample evidence, if believed by the jury, to support a positive finding that some external force applied or initiated by the employee Wilson was the cause. Wilson was in a position to know, better than anyone else, whether or not he or some inanimate object had struck the line of pipe at a point in the vicinity of which he was working. He testified by deposition that he had fallen against the pipe at the moment of the break. Had the jury believed that testimony, it could hardly have returned the verdict that it did. Wilson's credibility was therefore a question to be considered. As already recounted, however, Wilson, in personal conversations shortly after the accident, and later by letter written from Idaho, stated that he had in no way come in contact with the pipe. In his deposition, given shortly before the trial, but after he had been visited by one of appellant's agents, he assigned as the reason for his prior contrary statements the fact that, at the time of making those statements, he was laboring under fear caused by the result of the accident.

Wilson's deposition contained the only direct positive evidence touching the question of whether or not he had struck, or come in contact with, the pipe. While his sworn testimony appears to us to have the ring of truth, we are unable to say flatly that the jury,

which saw and heard all of the other witnesses in person, could not reasonably have believed that Wilson's prior statements, rather than his sworn testimony, were true. Under the evidence before us, our function does not permit us to say that Wilson's sworn testimony must be believed, and hence we cannot positively assert that it was conclusively established that the break in the pipe was caused by the act of Wilson.

Under appellant's second contention above stated, it affirmatively assigns three probable causes of the break which, it alleges, respondent, in turn, failed to exclude by a preponderance of the evidence: (1) that Wilson fell against the pipe, causing it to break; (2) misalignment between the two-inch pipe and the one-half inch pipe at the flange connection, resulting in excessive strain on the smaller pipe, caused by pulling the flange together with bolts; (3) vibration or mechanical tremor in the refrigerating system. All, or any one, of these three causes would relieve appellant from liability under the policy. Again, however, we say that our consideration of this tri-partite contention is upon the express reservation of the main and decisive question above stated.

The first contended factor, relating to Wilson's falling against the pipe, has already been considered, from the standpoint of the direct evidence upon the subject. There was other evidence, of a circumstantial nature, submitted by appellant, which tended strongly to prove that the break could not have occurred except through some external force. However, the only extraneous force specifically suggested in the case was the act of Wilson. On the other hand, respondent likewise submitted evidence of a circumstantial nature, which respondent contends was sufficient to warrant a finding that the break was not caused by Wilson's act. Apparently, the jury not only disbelieved Wilson's

sworn testimony, but also resolved the weight of the circumstantial evidence upon that particular issue in favor of respondent. Were this case one which, under all of the evidence, was properly submissible to the jury, then the verdict would no doubt have constituted a conclusive finding that the break did not occur through any act of Wilson.

With reference to misalignment, resulting in excessive strain, caused by pulling the flange together with bolts, appellant relies upon certain evidence produced by respondent itself, the effect of which we may concede would have warranted the jury in finding that the misalignment and consequent strain, combined, were the probable cause of the accident. However, there was additional evidence which tended to prove that the refrigerating system throughout, including the connection at the flange, was properly constructed, and that the pipeline was suspended by metal straps in such a way as to give play to the pipes, and thus to absorb any strain due to the tightening of the bolts in the flange. All of this latter evidence, the jury could have believed, were the case properly submissible to it, thus eliminating from its further consideration the second probable cause.

With reference to vibration or mechanical tremor, assigned by appellant as a third probable cause, there again was testimony by respondent's own witnesses, as hereinafter detailed, from which the jury could have concluded that vibration or tremor was present in the apparatus. On the other hand, there was positive evidence that no such forces were discernible. But whether or not there was vibration or tremor, visible or invisible, the presence of such forces would not, of itself, necessarily eliminate pressure as an efficient cause of the break. To the extent that vibration or tremor was present, if at all, it might have been re-

garded by the jury merely as a condition upon which some other force acted.

Thus far, we have dealt with these three probable causes from the standpoint of appellant's contentions. We shall have occasion, a little later, to refer to them again, from the standpoint of respondent's case, and of the burden resting upon it of showing that the bursting of the pipe was caused by pressure of the refrigerant.

Upon the physical facts presented by the evidence, the question of the producing cause resolved itself into a conflict between expert opinions. The theory of appellant, amply supported by the testimony of its expert witnesses, was that a pressure of from 28 to 35 pounds to the square inch could not possibly have broken or torn asunder the pipe, and that the break must have resulted from some external force. Those witnesses comprised a metallurgist, two mechanical and construction engineers who had specialized in refrigeration for a number of years, and one mechanical engineer whose qualifications included a long practical experience in power equipment and nineteen years' experience as a teacher in the engineering department of the University of Washington.

However, the opinions of those experts were based partly upon an examination of a piece of pipe which was introduced as an exhibit at the trial, and which, according to appellant's evidence, was the identical section of pipe wherein the break had occurred. Respondent, on the contrary, through certain of its lay witnesses, strenuously denied that the section produced in evidence was the piece of pipe that had been originally delivered to appellant for examination and analysis. The identity of the particular exhibit was therefore a further possible question for consideration by the jury, and the weight to be accorded to the testi-

mony given by appellant's expert witnesses would depend largely upon whether or not the jury believed that the exhibit offered by appellant was the piece of pipe that had sustained the injury. In this connection, it is worthy of note that, if appellant's exhibit is spurious, then we have no demonstrative evidence whatever concerning the broken part of the pipe, for nothing in that respect, other than appellant's particular exhibit, was offered by either party.

We conclude our discussion of appellant's specific contentions by saying that we are unable to state categorically that there was conclusive proof that the accident occurred by reason of any one of the particular factors assigned by appellant.

■ We now come directly to what we have already stated is the decisive question in the case, namely, whether or not there was sufficient evidence to take the case to the jury upon respondent's claim that the break in the pipe was caused by pressure of the refrigerant.

In this connection, it is to be kept in mind that the burden was not upon appellant to establish, as an affirmative defense, that the break was caused in some particular manner *other* than by pressure of the refrigerant. On the contrary, the burden was at all times upon respondent to show, by a preponderance of the evidence, that it was the pressure of the refrigerant that caused the break, for that was the only kind of accident against which the policy afforded protection to respondent. We will, therefore, consider the evidence in support of respondent's case.

With the evidence in the condition already narrated, respondent called two expert witnesses, both of whom were mechanical engineers and had ten or more years of practical experience in refrigeration. These witnesses sat through the trial and heard the testimony given by respondent's other witnesses.

On direct examination, a lengthy hypothetical question was propounded by respondent's counsel to each of its two experts. The question required them to assume, among other things, that the pipe was one-half inch heavy pipe, that the pressure therein ranged from 28 to 30 pounds per square inch, that the pipe was held in place by hangers as hereinbefore described, that no one had hit or touched the pipe, that no object, such as a box of apples, had come in contact with it, that there was no noticeable vibration in the pipe, that suddenly there was a loud noise, such as above described, that in consequence thereof ammonia in large clouds was emitted, and that, after the accident, examination of the pipe showed a break ranging from 1/32 to ⅛ of an inch in width, and running from 30 to 40 per cent around the circumference of the pipe. The question concluded with this inquiry:

"What, in your opinion, would have caused the break in that pipe?"

The first expert witness gave his answer, as follows:

"Three possible causes of failure have been eliminated. There is—that is, *the three possible causes that are most apparent.* Having not made an examination of the pipe and just listening to the evidence given, I would think that, when that pipe possibly was made up, when that was first fabricated and put together, that in screwing that half-inch pipe *into* the flange, that is, the connection to the two-inch pipe there, that *possibly* the flange was screwed on the half-inch pipe and maybe the bolt holes didn't meet. *That might be one, just one of the ideas occurring to me;* and to get those bolt holes to meet, they put some extra pressure on that flange, they tightened it up more, put extra pressure on there. Being a threaded place like that, and a small pipe, the sharp threads on the pipe would make an excellent place for a crack to start that wouldn't go through that pipe at the start but in the road of a sharp thread or a sharp angle is where a

failure, a crack, will always start. In tightening that and starting that little crack, well, then, over a period of years of use, I would say, pressure and changes of pressure—to take in changes of pressure, in the summer in most of these refrigeration plants; . . . those changes of pressure and the pressure that was on the pipe *could have kept that crack working and enlarging* until it got to such a thin point *probably* the pressure *might have perforated it.* . . . I would say the force of pressure caused it." (Italics ours.)

With reference to the initial "idea" advanced by this witness, respondent did not make any contention or offer any evidence that the bolts in the flange had ever been tightened, thereby starting a crack in the pipe. That theory would not have aided respondent's contention that the break was caused by pressure of the refrigerant within the pipe.

The other expert witness answered the same hypothetical question in the following language:

"In view of the fact that, in my opinion, the line is constructed properly or what would be considered good engineering, that there are two hangers on the line, that it has been testified to that there was no unusual visible vibration, and that no one—that is, it's been testified to that no one fell against the pipe or a box hit the pipe, it must have been internal force that caused the pipe to rupture."

It will be observed that these witnesses did not say that external force was *not* the most probable cause of a bursting of such a pipe. On the contrary, by reason of the way in which the question was framed, and by reason of some of the testimony by respondent's lay witnesses, the experts eliminated from their consideration "the three possible causes that are most apparent," and "under the circumstances" thought that internal pressure was the cause of the break. In other words, they assigned pressure as the probable cause

only upon the hypothesis that three other more probable causes had been eliminated by the evidence.

It will next be observed that the first expert witness gave, as his solution of the event, the possibility that, when the pipe was originally screwed into the flange, there was some misalignment, and that a tightening of the bolts might have resulted in a slight crack in the thread of the pipe, which, in the course of years, would become enlarged to such an extent that internal pressure would finally overcome the resistance of the pipe. The second expert witness, however, had no such theory of misalignment and strain, but, on the contrary, was of the opinion that the line was properly constructed and, as he said, would be considered as good engineering.

Upon cross-examination, both of these experts were asked to give their reasons for concluding that internal pressure had caused the break. They both conceded, and it is not contended to the contrary, that a normal one-half inch heavy steel pipe could not have been ruptured by a pressure of 28 or 30 pounds per square inch, which was the amount of pressure present in the pipe shortly before the time of the break. To meet that situation, the witnesses both evolved the theory that, due to some inherent or acquired flaw or defect in the metal, a microscopic crack had at some time developed in the thread of the pipe, and that, as time wore on, the crack had progressed inwardly to a point where the wall of the pipe had become so thin that it could no longer resist the pressure of even 30 pounds to the square inch.

Both witnesses, however, conceded that ordinarily before a rupture of the pipe would occur, a crack such as they described would manifest itself by a tell-tale leakage of ammonia. Respondent's lay witnesses who worked in, and were in charge of, the plant testified

positively and emphatically that there was no noticeable leakage of ammonia, and there is no evidence, or any reasonable inference from evidence, that there was ever any leakage of ammonia in the pipe. One of respondent's experts also admitted that internal pressure would not burst the pipe unless the crack had progressed to a point where the pipe had worn to a thinness of one ten-thousandth of an inch or less, and both of them proceeded upon the theory that the pipe had worn to such thinness that the rupture by pressure was inevitable. It might well be argued, as appellant contends, that, under that theory, the proximate cause of the rupture was not internal pressure at all, but a defect in the pipe, for which appellant would not be liable under the terms of its policy. We do not consider it necessary, however, to decide that question, in view of our conclusion upon what we have previously stated is the controlling question in the case.

The record is devoid of evidence of any inherent defect in the pipe, or of any crack originally caused by external strain subsequently progressing to the inner membrane of the pipe. Except for the exhibit submitted by appellant, which affords no such inference, no part of the pipe is in evidence, and so far as circumstantial evidence is concerned, the absence of leakage affords a stronger inference that the pipe had not previously sustained a crack, or been otherwise worn to an infinitesimal thickness.

In the final analysis, respondent's case hangs upon the evidence of its expert witnesses. The logic of their testimony is simply this: The pressure of the refrigerant *could* have caused the rupture if the pipe were worn to a thinness of approximately one ten-thousandth of an inch; the rupture did occur; therefore, the pipe must have been worn to the required point. This, however, is but reasoning in a circle.

It assumes a fact necessary to establish a cause of action, but concerning which assumed fact there is no evidence, and then employs the supposititious fact as the basis for a conjecture as to the possible cause of a particular physical result.

■ "In order to prove a fact by circumstances there should be positive proof of the facts from which the inference or conclusion is to be drawn. The circumstances themselves must be shown and not left to rest in conjecture." *The Cabo Hatteras* ( N. Y. 1933), 5 Fed. Supp. 725.

In *Georgia Power Co. v. Edmunds*, 233 Ala. 273, 171 So. 256, the court makes a very clear statement of the probative effect of circumstantial evidence. We quote:

" ' "Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause."

" 'But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent *with known facts or conditions*, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is *evidence* which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.' " (Italics ours.)

In the case at bar, there is no evidence of any known facts pointing to, or consistent with, the theory that the pipe had become worn to a thinness of one tenthousandth of an inch and then had been broken by pressure from within. It is a case of indulging in a

presumption in order to support a conjecture. Presumptions may not be pyramided upon presumptions, nor inference upon inference. *Johnson v. Western Express Co.,* 107 Wash. 339, 181 Pac. 693; *Mumma v. Brewster,* 174 Wash. 112, 24 P. (2d) 438.

"We will infer a consequence from an established circumstance. We will not infer a circumstance when no more than a possibility is shown." *Parmelee v. Chicago, M. & St. P. R. Co.,* 92 Wash. 185, 194, 158 Pac. 977, 981.

■ ■ As already stated, respondent's case rests ultimately upon expert opinion. But the opinions of expert witnesses are of no weight unless founded upon facts in the case. The law demands that verdicts rest upon testimony, and not upon conjecture and speculation. *Anton v. Chicago, M. & St. P. R. Co.,* 92 Wash. 305, 159 Pac. 115.

In *Bucher v. Wisconsin Central R. Co.,* 139 Wis. 597, 120 N. W. 518, appears the following statement, with which we are in accord:

"The verdict of a jury founded upon facts is entitled to great weight, and is almost conclusive upon this court if supported by any evidence. But the verdict of a jury founded only upon the opinion of experts concerning the cause of a condition, which condition is itself established by the opinion of experts, has no such weight. As was said in *Baxter v. C. & N. W. R. Co.,* 104 Wis. 307, 330, 80 N. W. 644, 652:

" 'Opinion evidence alone is not conclusive in any case. The jury must pass upon the probabilities, and unless the opinion relied on is within the scope of reason and common sense it should not be regarded at all.' *Johnson v. G. N. R. Co.* (Minn.) 119 N. W. 1061."

The burden was upon respondent to show that the break in the pipe was caused by pressure of the refrigerant. It has not met that burden by evidence sufficient to take the case to the jury. The verdict of the jury rests upon conjecture, and not upon evidence.

In view of our conclusion upon this issue, it becomes unnecessary to discuss the second main question in the case, relating to the extent of the damage to the fruit.

The judgment is reversed, with direction to the trial court to dismiss the action.

BLAKE, C. J., BEALS, and JEFFERS, JJ., concur.