## COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Involuntary Treatment of | ) ) ) | No. 33112-1-III |
| A.J., | ) ) | ORDER GRANTING MOTION TO PUBLISH OPINION IN PART |
| Appellant. | ) ) ) ) | AND WITHDRAWING THE OPINION FILED AUGUST 4, 2016 |

THE COURT has considered appellant's motion to publish opinion in part and is of the opinion the motion should be granted. Therefore,

IT IS ORDERED, the motion to publish opinion in part of this court's decision of August 4, 2016, is hereby granted.

IT IS FURTHER ORDERED, the court's opinion filed August 4, 2016, is hereby withdrawn and a new opinion will be filed this day.

PANEL: Judges Fearing, Siddoway, Korsmo

FOR THE COURT:

_George Fearing_
_____
GEORGE B. FEARING, Chief Judge

FILED
SEPTEMBER 22, 2016
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Involuntary Treatment | ) | |
| of | ) | No. 33112-1-III |
| | ) | |
| A.J.† | ) | |
| | ) | OPINION PUBLISHED |
| | ) | IN PART |
| | ) | |

SIDDOWAY, J. — The trial court involuntarily committed A.J. to 180 days of mental health treatment. A.J. appeals, arguing that (1) though his commitment has ended, this case is not moot, (2) insufficient evidence supported the jury's verdict that he was "gravely disabled", and (3) trial counsel provided ineffective assistance when he did not object to a misleading jury instruction on the State's burden of proof. We find no error and affirm.

In response to a motion to publish, we have modified the sequence in which the issues are addressed. We address the claim of ineffective assistance of counsel in the published portion of our opinion, recognizing that it may be helpful to defendants requesting a modification of the Washington pattern instruction on the burden of proof in involuntary treatment cases.

---

† For purposes of this opinion, the appellant's initials are used in place of his name.

No. 33112-1-III
*In re Involuntary Treatment of A.J.*

FACTS AND PROCEDURAL HISTORY

On June 29, 2014, A.J. was detained for involuntary mental health treatment at Sacred Heart Medical Center. A.J. was detained because he had stopped taking his antipsychotic medications and had decompensated, becoming "agitated, confrontational, religiously preoccupied, grandiose, paranoid, and delusional." Clerk's Papers (CP) at 33. About two weeks later, the Spokane County Superior Court committed A.J. to Eastern State Hospital for 90 days for involuntary mental health treatment. Near the end of the 90 days, Dr. Patricia Gunderson and Dr. Laura Seymour petitioned the court for an order allowing up to 180 additional days of involuntary treatment for A.J. The doctors alleged A.J. required continued hospitalization because he was gravely disabled as a result of his mental disorder. A.J. requested a jury and the three-day trial was held in early January 2014. During the trial, the State presented testimony from three witnesses to support the involuntary commitment. The substance of the State's evidence is described in the unpublished portion of this opinion.

At the close of the trial, the court instructed the jury on the State's burden of proof using a jury instruction almost identical to a Washington Pattern Jury Instruction (WPI). The jury found A.J. gravely disabled and the court entered an order involuntarily committing A.J. for up to 180 days at Eastern State Hospital. A.J. timely appeals.

2

No. 33112-1-III
*In re Involuntary Treatment of A.J.*

ANALYSIS

We lead with our discussion of A.J.'s claim of ineffective assistance of counsel.

*1. A.J.'s trial counsel did not provide ineffective assistance*

"Generally, under the [voluntary commitment] statute, RCW 71.05, persons may be involuntarily committed for treatment of mental disorders if, as a result of such disorders, they either (1) pose a substantial risk of harm to themselves, others, or the property of others, or (2) are gravely disabled." *In re Det. of LaBelle*, 107 Wn.2d 196, 201-02 (citing RCW 71.05.020(1)(3), .150, .240, .280, .320). Where a 180-day commitment is at issue, the burden of proof is clear, cogent, and convincing evidence, "which means the ultimate fact in issue must be shown by evidence to be 'highly probable.'" RCW 71.05.310; *LaBelle*, 107 Wn.2d at 209.

A.J. argues his trial counsel provided ineffective assistance when he allowed the court to provide the jury with an instruction that essentially misstated the State's burden of proof. The challenged jury instruction—which is almost identical to WPI 360.06[1]—defined the clear, cogent, and convincing standard of proof:

---

[1] 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 360.06 (6th ed. 2012) (WPI). There are two minor differences between the instruction given and the pattern instruction. Those differences are both in the last sentence of the third paragraph: "Reasonable doubt means such a doubt *as exists* in the mind of a reasonable person after fully, fairly, and carefully considering *all the evidence* or lack of evidence." WPI 360.06 (emphasis added).

3

No. 33112-1-III
*In re Involuntary Treatment of A.J.*

Instruction No. 4: Eastern State Hospital is the petitioner, and has the burden of proving each element of its case by clear, cogent and convincing evidence. Clear, cogent and convincing evidence exists when the element has been shown by the evidence to be highly probable.

Proof by clear, cogent and convincing evidence requires a greater showing than is required under the preponderance of the evidence standard that is used in many other civil cases. Preponderance of the evidence exists when an element has been shown to be more probably true than not true.

On the other hand, proof by clear, cogent and convincing evidence does not require as great a showing as is required under the reasonable doubt standard used in criminal cases. Reasonable doubt means such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence.

Preponderance of the evidence and beyond a reasonable doubt are defined here solely to aid you in understanding the meaning of clear, cogent and convincing evidence.

Report of Proceedings (RP) at 155.

Specifically, A.J. argues that by using the criminal reasonable doubt standard for comparison without stating it requires the jury to find an element "beyond" a reasonable doubt, the instruction misled the jury into thinking that under the reasonable doubt standard, a jury could convict a criminal defendant even if it had a reasonable doubt. A.J. argues that because this lowered the criminal reasonable doubt standard offered as a comparison, it also lowered what the jury perceived the clear, cogent, and convincing standard to be—effectively lowering the State's burden of proof.[2]

_____

[2] A.J. proposes the following instruction:
Eastern State Hospital is the petitioner, and has the burden of proving each element of its case by clear, cogent, and convincing evidence. Clear, cogent, and convincing evidence exists when the element has been shown by the evidence to be highly probable.

4

No. 33112-1-III
*In re Involuntary Treatment of A.J.*

To demonstrate ineffective assistance of counsel a defendant must prove that counsel's representation was deficient, and that the deficient representation prejudiced the defendant. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987)). The claim fails if the defendant fails to satisfy either prong. *Thomas*, 109 Wn.2d at 226. There is a strong presumption that counsel performed effectively. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A claim of ineffective assistance of counsel is a mixed question of law and fact and is reviewed de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

A.J. cannot establish that counsel's representation was deficient. It is not deficient representation to fail to object when the court gives the jury a pattern jury instruction.

---

Proof by clear, cogent, and convincing evidence requires a greater showing than is required under the preponderance of the evidence standard that is used in many other civil cases. Preponderance of the evidence exists when an element has been shown to be more probably true than not true.

On the other hand, proof by clear, cogent, and convincing evidence does not require as great a showing as is required under the *"beyond a reasonable doubt"* standard used in criminal cases. *In a criminal case, the State has the burden of proving each element of a crime beyond a reasonable doubt.* Reasonable doubt means such a doubt as exists in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence.

Preponderance of the evidence and beyond a reasonable doubt are defined here solely to aid you in understanding the meaning of clear, cogent, and convincing evidence.

Br. of Appellant at 27-28 (suggested alterations italicized).

*See State v. Studd*, 137 Wn.2d 533, 551, 973 P.2d 1049 (1999) (finding counsel was not ineffective for proposing a then-unquestioned pattern jury instruction). However, though we find counsel provided effective representation, A.J.'s suggestion that the instruction could be improved is well taken. The Washington Pattern Instructions Committee should consider revising the instruction to make clear that under the reasonable doubt standard the jury must find the essential facts *beyond* a reasonable doubt.

We affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

## 2. This appeal is not moot

A.J. argues that although his period of involuntary commitment has ended, this appeal is not moot. An appeal is moot if the court can no longer provide effective relief. *Orwick v. City of Seattle*, 103 Wn.2d 249, 253, 692 P.2d 793 (1984). "An individual's release from detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention." *In re Det. of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012) (citing *Born v. Thompson*, 154 Wn.2d 749, 762-64, 117 P.3d 1098 (2005); *Monohan v. Burdman*, 84 Wn.2d 922, 925, 530 P.2d 334 (1975)).

6

Because under chapter 71.05 RCW "the trial court is directed to consider, in part, a history of recent prior civil commitments . . . each order of commitment entered up to three years before the current commitment hearing becomes a part of the evidence against a person seeking denial of a petition for commitment." *M.K.*, 168 Wn. App. at 626 (footnote omitted) (citing RCW 71.05.012, .212, and .245). Accordingly, because each commitment order has collateral consequences in subsequent petitions and hearings, the issue is not moot. *Id.*; *accord In re Det. of H.N.*, 188 Wn. App. 744, 749-50, 355 P.3d 294 (2015), *review denied*, 185 Wn.2d 1005 (2016).

*3. Substantial evidence supports the jury's finding that A.J. was gravely disabled*

A.J. argues the State did not present sufficient evidence to support the jury's finding that he was gravely disabled. "[I]nvoluntary commitment for mental disorders is a significant deprivation of liberty which the State cannot accomplish without due process of law." *LaBelle*, 107 Wn.2d at 201 (citing *Dunner v. McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444 (1984); *In re Harris*, 98 Wn.2d 276, 654 P.2d 109 (1982)). In fact, the United States Supreme Court has characterized involuntary commitment as "a massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972). Though "the State has a legitimate interest under its police and *parens patriae* powers in protecting the community from the dangerously mentally ill and in providing care to those who are unable to care for themselves, . . . mental illness alone is not a constitutionally adequate basis for involuntary commitment." *LaBelle*, 107

7

Wn.2d at 201. Accordingly, "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975).

As earlier observed, "Generally, under the [voluntary commitment] statute, RCW 71.05, persons may be involuntarily committed for treatment of mental disorders if, as a result of such disorders, they either (1) pose a substantial risk of harm to themselves, others, or the property of others, or (2) are gravely disabled." *LaBelle*, 107 Wn.2d at 201-02 (citing RCW 71.05.020(1)(3), .150, .240, .280, .320). In this case, A.J. was involuntarily committed under the gravely disabled standard. Under RCW 71.05.020(17),

> "Gravely disabled" means a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

An individual may be involuntarily committed if he is found gravely disabled under either alternative (a) or (b). *LaBelle*, 107 Wn.2d at 202.

To satisfy the alternative (a) and show the individual "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety," RCW 71.05.020(17)(a), "the State must present recent, tangible

8

evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *LaBelle*, 107 Wn.2d at 204-05. "[T]he failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors." *Id.*

### The State's Evidence

Dr. Gunderson, a psychologist at Eastern State Hospital in Washington, testified first. Dr. Gunderson evaluated A.J. on October 1, 2014. Because A.J. refused to speak with Dr. Gunderson, she testified that the basis of her evaluation was A.J.'s "ward chart," which consisted of "all the documentation from his current admission, the assessments when he first arrived, all the progress notes up to that time, treatment orders, [and] any legal documents in the chart." RP at 46. Though at the time of the evaluation Dr. Gunderson had not reviewed any past records or interviewed the staff at Eastern State Hospital, she had done both by the time of trial.

Dr. Gunderson testified to her conclusion that A.J. is schizophrenic. She stated A.J.'s schizophrenia manifests in paranoid and grandiose delusions, such as believing that the government is after him, that his hospitalization is the result of a plot against him, and that he once worked as an undercover operative for the FBI. She also testified that A.J. has religious delusions and believes God and the devil speak to him and tell him to do things. Dr. Gunderson stated A.J. has hallucinations and hears voices when he is not on

9

his medication. Finally, Dr. Gunderson testified that A.J. has a lack of insight into his schizophrenia, and does not believe he has a mental illness or that he needs medications. At times he also has poor hygiene.

Dr. Gunderson stated that due to A.J.'s paranoia, she thought it would be difficult for him to find housing if he were released. She also said that, based on A.J.'s history of not taking his medication (even while in the hospital), she did not believe he would take his medication if he were discharged. Consequently, Dr. Gunderson stated she believed. A.J. was gravely disabled and that, if released, he would be in danger of serious physical harm because of his inability to provide for his essential needs of health and safety.

Dr. Seymour, another psychologist at Eastern State Hospital, was the State's next witness. Dr. Seymour was A.J.'s treating psychiatrist beginning in late August 2014, and testified to meeting with him usually more than once a month. She stated this was A.J.'s fourth hospitalization at Eastern State Hospital, and that he had been hospitalized at other hospitals as well. Dr. Seymour evaluated A.J. the week before trial. She testified that the basis of this evaluation was A.J.'s medical chart, part of his past records, discussions with A.J.'s treatment team, and her own observations of him.

Dr. Seymour testified that A.J. suffers from chronic paranoid schizophrenia, antisocial personality traits, and use of cannabis and methamphetamines. She testified to the same symptoms as Dr. Gunderson: paranoia that the police are after him, an inability

to trust anybody, religious delusions, hallucinations, lack of insight into his mental illness and need for medication, refusal to take his medication, and poor hygiene.

Additionally, Dr. Seymour testified that without medication A.J.'s thought process is disorganized and he does not understand what is going on around him and often misinterprets situations, believing that people are "out to get him." RP at 71. She said the antisocial personality trait she saw most was his irritability, which she believed was exacerbated by his substance use. She described an instance in the past year in which A.J. was trying to obtain shelter at a homeless shelter. When he was refused admittance, A.J. picked up a large two-by-four and wielded it at the staff. When the police arrived, A.J. put down the two-by-four and picked up a sharp object and began threatening the police with it. The police tased him, but A.J. then lunged at them and the police shot him "many times." RP at 82.

Though A.J.'s symptoms are not all resolved when he is on medication, Dr. Seymour testified that when he is taking medication, the symptoms are much more controlled. She said within the last year A.J. had achieved a baseline—an individual's level of functioning under the maximum amount of treatment—under which he suffered only mild paranoia and delusions that did not interfere with his ability to obtain food and shelter.

Based on all of this information, Dr. Seymour testified that if A.J. were discharged, she did not believe he would take his medication, and that without

11

medication he would have difficulty maintaining a routine and would be more susceptible to using substances as a result. She also stated she believed his safety was at risk because of his paranoia, as demonstrated by the altercation with the police. Finally, she said she did not believe he would be capable of paying bills, obtaining housing, accessing his social security, working with people to obtain housing or manage his finances, or maintaining proper hygiene. Dr. Seymour opined that A.J. was gravely disabled, and that if released, he would be unable to provide for his essential needs of health and safety.

Michelle Wendt, a psychiatric social worker at Eastern State Hospital, was the State's third and final witness. At the time of trial, Ms. Wendt was A.J.'s social worker and part of his treatment team, and had been since August 28, 2014. Ms. Wendt testified to seeing A.J. daily in the hall, and meeting with him on a weekly basis.

Ms. Wendt testified that her discharge plan for A.J. was to place him in group housing to ensure his daily needs of shelter, food, medications, and medical treatment were met—needs she did not believe him capable of fulfilling on his own. Ms. Wendt attempted to access group housing for A.J., but because A.J. has not consented to an interview with the housing provider, she has been unable to obtain that housing. Ms. Wendt stated A.J. expressed his intention to live with friends, but would not disclose any information about the friends, and consequently, she was unable to verify that such a placement would provide adequate mental health follow-up treatment for him. She also discussed his difficulty interacting with others, which she felt would be a problem if he

12

were released. Based on this evidence, Ms. Wendt opined that A.J. would be unable to meet his health and safety needs if he were discharged.

The State's evidence was sufficient

The State provided sufficient evidence to show A.J. was gravely disabled under alternative (a). Dr. Gunderson testified that due to A.J.'s paranoia and resultant inability to interact with others, it would be difficult for him to find housing. She also stated A.J. has hallucinations when he does not take his medication, and that she did not believe he would take it if he were discharged. This opinion was based on Dr. Gunderson's recent (October 2014) evaluation of A.J.'s ward chart from his then-current admission.

Dr. Seymour testified this was A.J.'s fourth hospitalization and that A.J. was disorganized and often did not understand what was going on around him, something that fed into his misinterpretation of situations as plots against him. Dr. Seymour pointed to an example from within the past year (the police tasing and shooting him) of the actual physical harm that occurred as a result of A.J.'s paranoia. She also testified that, if released, A.J. would likely not take his medication, and would therefore have difficulty maintaining a routine, would be at increased risk for substance abuse, and would be unable to pay bills, obtain housing, access social security, or maintain proper hygiene.

Finally, Ms. Wendt testified that, based on her direct weekly interactions with A.J. beginning in August 2014, she did not believe him capable of providing for his daily needs of shelter, food, medication, or medical treatment. The conclusion each of these

13

witnesses came to was that, if released, A.J. would be in danger of serious physical harm because of his inability to provide for his basic needs of health and safety. This is sufficient evidence of A.J.'s recent inability to provide for his essential needs of health and safety to establish—under a clear, cogent, and convincing standard of proof—that A.J. was gravely disabled under the alternative (a).

However, A.J. contends the expert testimony from the State's three witnesses cannot provide the basis for any findings of fact because the witnesses based their opinions on inadmissible evidence. A.J. cites *Prentice Packing & Storage Co. v. United Pacific Insurance Co.*, 5 Wn.2d 144, 164, 106 P.2d 314 (1940) in support of this contention. But *Prentice* establishes no such rule. There, the court stated verdicts must "rest upon testimony, and not upon conjecture and speculation." *Id.* at 164; *accord Davidson v. Municipality of Metro. Seattle*, 43 Wn. App. 569, 575-78, 719 P.2d 569 (1986) (finding expert's opinion lacked factual basis where the expert assumed a variety of facts for which no evidence existed in the record). This does not mean the evidence underlying the expert's opinion must be admitted at trial in order for the opinion to form the basis of the court's findings. *See Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue*, 106 Wn.2d 391, 397-401, 722 P.2d 787 (1986) (finding expert's testimony was properly admitted where it was not based solely on conjecture and speculation, and where opposition had ample opportunity to cross-examine him and present its own expert testimony). If specialized knowledge will help the jury to determine a fact in issue, an

14

expert may testify to his or her opinion so long as he or she bases that opinion on facts or data that are of the type reasonably relied on by experts in that field. ER 702, 703. Those facts or data do not need to be admissible in evidence. ER 703; *see LaBelle*, 107 Wn.2d at 209-11 (finding substantial evidence for an involuntary commitment order where the only evidence was expert testimony from one doctor); *In re Det. of Marshall*, 122 Wn. App. 132, 90 P.3d 1081 (2004), *aff'd*, 156 Wn.2d 150, 125 P.3d 111 (2005).

In this case, each witness testified to A.J.'s mental state, which required specialized knowledge and experience. Both Dr. Gunderson and Dr. Seymour testified the records they relied on in forming their opinions were the type reasonably relied on by experts in their particular field. Furthermore, Ms. Wendt, who had direct weekly contact with A.J., testified her opinion was based on her own personal observation of A.J. The testimony complied with ER 702 and 703 and was sufficient to allow the jury to find A.J. gravely disabled.

Affirmed.

_____
Siddoway, J.

WE CONCUR:

_____       _____
Fearing, C.J.                       Korsmo, J.