IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| DAGMAR VON HEYDT, | No. 82304-3-I |
| Respondent/Cross Appellant, | (consolidated with No. 82401-5-I) |
| v. | |
| MICHELLE EBERT and JASON A. BRUERS, wife and husband and the marital community composed thereof, | UNPUBLISHED OPINION |
| Appellants/Cross Respondents. | |

BOWMAN, J. — Michelle Ebert and Jason Bruers appeal jury verdicts for fraud, unjust enrichment, breach of fiduciary duty, breach of contract, and intentional infliction of emotional distress in favor of Ebert's mother, Dagmar von Heydt. Ebert and Bruers allege several evidentiary and instructional errors and argue the trial court abused its discretion by denying their postverdict motions. They also argue substantial evidence does not support the jury verdicts and cumulative error resulted in an unfair trial. Von Heydt cross appeals the trial court's order denying her request for attorney fees. We remand to vacate the jury's verdict on the fraud claim as to Bruers but otherwise affirm.

FACTS

Ebert is von Heydt's youngest child and only daughter. Ebert enjoyed a close relationship with von Heydt growing up and into her early adult years. The two spent considerable time together, particularly as Ebert started a family with

her husband David Ebert in the 1990s. David[1] owned adult entertainment businesses and met Ebert when she worked as a dancer in one of his clubs.

A federal prosecution for racketeering in July 2010 forced David out of the adult entertainment industry. In 2013, Ebert and David divorced. But Ebert stayed in the adult entertainment business. She took out a loan to buy a building on 4th Avenue South in Seattle and started a limited liability company, MRAE LLC, to manage the building. Ebert was the sole member of MRAE, which held the building as its only asset. In January 2014, Ebert opened a nightclub on the property called Kittens Adult Cabaret. Ebert owned Kittens through K-Cab LLC (KCAB), another company she created with herself as its sole member. Kittens rented space in the 4th Avenue South building from MRAE.

Since Kittens occupied about two thirds of the 4th Avenue South building, Ebert decided to open a second business in the remaining space. She first considered opening a lingerie store but changed her mind after receiving advice from Kittens employee Xten Barton. Barton suggested Ebert make the space into a restaurant and bar because Washington prohibits alcohol inside adult entertainment clubs. A restaurant would complement Kittens, allowing patrons to access food and beverages right next to the club. Ebert thought the idea was "great." She secured a $300,000 loan from a private lender and began transforming the extra space into the Dog House Bar and Grill (TDH).

Ebert began dating Bruers in April 2014. Bruers worked in construction and helped build TDH. But to operate as a bar, TDH needed a liquor license

---

[1] We refer to David Ebert by his first name for clarity and intend no disrespect by doing so.

from the Washington State Liquor Control Board (WSLCB).[2] Ebert had a prior conviction that she thought could make it harder for her to get the license. But mostly, Ebert worried the WSLCB would be suspicious if she applied for a liquor license while also owning Kittens. So she asked von Heydt to apply for the license.[3] Von Heydt agreed. Ebert then arranged for her attorney to create TDH LLC with von Heydt owning 90 percent and Barton owning 10 percent. In May 2014, TDH[4] executed a lease with MRAE to pay rent of $5,000 per month for a term of five years. In August, the WSLCB approved TDH's liquor license.

According to von Heydt, Ebert also approached her with a plan to invest money in TDH. Ebert told von Heydt the investment would give Ebert sufficient funds to complete the bar and give von Heydt financial security through a share of TDH's profits. Ebert suggested von Heydt sell her Everett condominium, which she owned mortgage free, and put the sale profits and other cash assets into the business. In exchange, Ebert would give von Heydt an immediate place to live on Ebert's 20-acre property in Kent and later build von Heydt her own home. Relying on Ebert's promises, von Heydt listed her condominium for sale in April 2014 and it sold in June. Von Heydt then moved to Ebert's property.

Von Heydt transferred $110,000 from the condo sale into a joint account she opened with Ebert. Ebert used money from the joint account to purchase a "tiny house" for von Heydt. She placed it on the Kent property and von Heydt lived there for the next year and a half. Von Heydt also transferred her cash

---

[2] Now known as the Washington State Liquor Cannabis Board.

[3] The WSLCB had issued von Heydt a liquor license before.

[4] We refer to TDH and TDH LLC collectively as TDH.

savings of $25,000 into the joint account and another $90,000 she received as a payout from an investment with David.[5]  Von Heydt eventually added $10,000 she received from a different investment.  By July 2014, von Heydt had deposited $235,000 into the joint account to benefit TDH.

Ebert testified that the money von Heydt gave her for the benefit of TDH was not an investment but a loan.  Ebert said the original $300,000 loan she secured plus $164,000 of her own money was not enough to cover all the costs of opening TDH so she approached von Heydt for help.  Ebert did not formally document the loan from von Heydt.  She said, "The only thing that I told my mom is if I can borrow some money, I'd pay her back."  According to Ebert, von Heydt was "holding" the liquor license until Ebert repaid the loan "whenever it's convenient."  Ebert also claimed von Heydt loaned her only $95,000.  She testified she "quickly" repaid von Heydt by October 2015 plus interest.  Ebert said she paid von Heydt $117,000 that she could "trace" and "at least $18,000 in cash" that she kept track of "all in [her] head."  She later testified that she repaid von Heydt a total of $170,000.  Ebert also insisted von Heydt did not sell her condominium to invest in TDH.  She claimed von Heydt had been dissatisfied with the condo for a long time and wanted to sell it so she could stop paying the property assessments.

TDH opened to the public in September 2014.  Shortly after, Ebert accused Barton of stealing money from the business and fired him.  Bruers then

---

[5] Ebert asserted that the documents von Heydt produced to show the $90,000 was a payout from von Heydt's investment were all "forgeries" and "frauds" and that half the money belonged to her.

quit his construction job and began working at TDH.  In December 2014, Barton signed over his 10 percent ownership of TDH to Bruers.  Meanwhile, relations between von Heydt, Ebert, and Bruers began to deteriorate rapidly.  In January 2015, Ebert had von Heydt sign a "Memorandum of Gift" that relinquished her share of TDH to Bruers, giving him 100 percent ownership at no cost.[6]  Von Heydt later claimed she did not read the document before signing.  She said she routinely signed paperwork for TDH at Ebert's request without question.  Also in January 2015, TDH executed a commercial lease with Ebert Leasing, another company owned solely by Ebert.  TDH agreed to pay Ebert Leasing a monthly fee to lease restaurant equipment.

Ebert and Bruers married on February 14, 2016.  Von Heydt was realizing life on Ebert's property was not what she expected.  And she was not receiving profits from TDH.  After Ebert's wedding, von Heydt moved into Ebert's three-bedroom house and Ebert and Bruers moved into the tiny house.  Still, von Heydt "didn't like" living in south King County and wanted to move back to Everett.

Things continued to sour between von Heydt, Ebert, and Bruers in 2016.  A series of events at the Kent property led to police involvement and mutual restraining orders.  The big house lost power, heat, water, and septic services.  Von Heydt suspected Ebert and Bruers cut off the services.  She had to buy water in gallon jugs for drinking and bathing and had to defecate in toilets lined with plastic bags for two weeks.  Von Heydt testified that someone locked the main gate of the property so she could not access it and that she once awoke to

---

[6] Ebert testified she lost the signed Memorandum of Gift so she had von Heydt sign a "second gift letter" on January 15, 2017.  Ebert eventually found the first Memorandum of Gift.

Ebert and Bruers outside the house shining flashlights into her room. Von Heydt testified that Ebert threatened her and yelled obscenities. She described the experience as a "nightmare."

In January 2017, Ebert's brother Stacy Hatch arrived at the big house to help von Heydt. He said the conditions were so bad that they "had to leave." Von Heydt withdrew $129,000 from the joint bank account she shared with Ebert and left the Kent property for good in February 2017. She used the money to buy a new condominium in Everett. But because market values had increased between 2014 and 2017, von Heydt could not pay the entire sales price and had to finance her purchase with a mortgage of $55,000. Von Heydt testified that Ebert's actions depleted her assets, essentially leaving her financially destitute.[7]

In September 2018, von Heydt sued Ebert and Bruers. In November 2019, she amended the complaint to include several allegations, including breach of contract as to Ebert, fraud as to Ebert and Bruers, unjust enrichment as to Ebert and Bruers, breach of fiduciary duty as to Ebert, and intentional infliction of emotional distress as to Ebert and Bruers. Von Heydt sought damages for lost profits from TDH, emotional distress, and other costs associated with Ebert's breach of her promises. She also sought attorney fees and costs. Ebert and Bruers alleged counterclaims for breach of fiduciary duty and conversion and sought damages, attorney fees, and costs.[8]

---

[7] Von Heydt filed a small claims suit against Ebert and Bruers on January 23, 2017. She claimed they owed her $3,495 for a loan, merchandise, and property damage, explaining, "Took car back w[ith] merchandise in it, will not return it. Loan was for Defendants['] Bar & Grill."

[8] In January 2020, MRAE began leasing the restaurant to ZDH LLC instead of TDH. ZDH, a partnership consisting of one of Ebert's sons and one of Bruers' sons, "took over" TDH at no cost other than the monthly rent to MRAE.

In July 2020, Ebert and Bruers moved for summary judgment dismissal of von Heydt's complaint. The trial court denied the motion, finding "genuine issues of material fact" precluded summary judgment.

Trial began in November 2020. Ebert argued TDH had no profits from 2014 to 2018. But von Heydt presented testimony from certified public accountant (CPA) David Beail to show that Ebert had artificially depleted TDH's accounts. The evidence showed that Ebert, through MRAE, increased TDH's rent from $5,000 per month in 2014 to $10,000 per month in 2015 even though the original lease agreement was for five years. TDH also began paying Ebert Leasing $420 per month in 2015 for the restaurant equipment. Ebert said she executed these agreements to help her recoup the cost of the $300,000 loan she took out to start TDH. But Beail opined that if TDH paid rent per the original lease agreement and properly offset certain promotional costs to Kittens, TDH would have actually netted a profit of $128,226 in 2018 alone instead of its reported $35,298 loss. According to Beail, TDH should have had a yearly income averaging about $106,203 from 2015 to 2019.

Following a three-week trial, the jury found for von Heydt on all claims and rejected Ebert and Bruers' counterclaims. While the jury found Ebert breached a contract with von Heydt, it did not award damages for that claim. After adjusting for duplicate damages, the jury awarded von Heydt $649,565 from Ebert and $114,888 from Bruers for a total of $764,453 in damages.

The trial court entered judgment on the jury's verdict, including postjudgment interest. The court later amended the judgment to award von

Heydt $7,185 in costs.  Von Heydt then moved for an award of prejudgment interest and attorney fees.  Ebert and Bruers moved for judgment notwithstanding the verdict (JNV), remittitur, and, in the alternative, a new trial.  The trial court denied the motions.

Ebert and Bruers appeal and von Heydt cross appeals.

ANALYSIS

Ebert and Bruers appeal the jury's verdict and the trial court's judgment, alleging the court committed several evidentiary and instructional errors, substantial evidence does not support the jury's verdict, cumulative error resulted in an unfair trial, and the trial court abused its discretion by denying their postverdict motion.  Von Heydt asserts the trial court erred in denying her request for attorney fees and asks for attorney fees on appeal.  We address each argument in turn.[9]

I.  Evidentiary Errors

Ebert and Bruers identify four evidentiary rulings they claim were error.  They argue the court should have allowed evidence of David's prior felony conviction, video of a family confrontation, and evidence of von Heydt's 2017 small claims suit against Ebert and Bruers.  They also argue the court erred by admitting exhibits 59 and 60 showing summaries of von Heydt's financial contributions to TDH and her partial return of the contributions.  We disagree.

We review a trial court's evidentiary rulings for an abuse of discretion. Saldivar v. Momah, 145 Wn. App. 365, 394, 186 P.3d 1117 (2008) (citing

---

[9] Von Heydt moved to strike the appendices attached to Ebert and Bruers' reply brief. We grant the motion.

Hoglund v. Meeks, 139 Wn. App. 854, 875, 170 P.3d 37 (2007)). A trial court abuses its discretion when its decision is manifestly unreasonable or it bases its decision on untenable grounds. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006). " '[E]videntiary error is grounds for reversal only if it results in prejudice.' " Bengtsson v. Sunnyworld Int'l, Inc., 14 Wn. App. 2d 91, 99, 469 P.3d 339 (2020) (quoting City of Seattle v. Pearson, 192 Wn. App. 802, 817, 369 P.3d 194 (2016)).

Evidence must be relevant to be admissible. ER 402. Evidence is relevant if it is both probative and material. Bengtsson, 14 Wn. App. 2d at 105 (citing Davidson v. Muni. of Metro. Seattle, 43 Wn. App. 569, 573, 719 P.2d 569 (1986)). Probative evidence tends to prove or disprove some fact. Id. Material evidence is of consequence to the ultimate outcome of the case. Id. Under ER 403, the court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." "[E]vidence may be unfairly prejudicial under [ER] 403 if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or 'triggers other mainsprings of human action.' " Carson v. Fine, 123 Wn.2d 206, 223, 867 P.2d 610 (1994) (quoting 1 J. WEINSTEIN & M. BERGER, EVIDENCE § 403[03], at 403-36 (1985)).

A. David's Prior Conviction

Ebert and Bruers argue the trial court should have allowed them to admit evidence of David's prior conviction for racketeering to show the jury he lacked credibility.

9

Under ER 609(b), evidence of a conviction

is not admissible if a period of more than 10 years has elapsed
since the date of the conviction or of the release of the witness from
the confinement imposed for that conviction, whichever is the later
date, unless the court determines, in the interests of justice, that the
probative value of the conviction supported by specific facts and
circumstances substantially outweighs its prejudicial effect.

Under ER 609, David's conviction was stale because it occurred more than 10 years before trial.[10]  Still, the trial court conducted a balancing test to determine whether it should otherwise allow the evidence in the interests of justice.  It concluded that the facts and circumstances did not render the conviction more probative than prejudicial.  Ebert and Bruers point to no facts and circumstances surrounding David's conviction that warrant admissibility in the interests of justice.  The trial court did not abuse its discretion in excluding the conviction.

In any event, any error would have been harmless.  The jury heard evidence that David's business got "busted by the Feds," that a "criminal prosecution by the federal government" ensued, that he had "charges . . . against him," that a grand jury considered the case, and that he received "probation." From this evidence, Ebert and Bruers were able to argue David's credibility to the jury.

B.  Video of Family Confrontation

Ebert and Bruers claim the trial court erroneously excluded video evidence of a family confrontation in January 2017 around the time family conflict was at its

---

[10] The United States District Court issued its original judgment against David in July 2010.  Trial began November 2020.

highest and von Heydt moved off the Kent property. They contend the video showed "how the family dynamics operated" at the time and contradicted von Heydt's claim of emotional distress. But the trial court viewed portions of the video and determined it showed little of von Heydt, consisting of only a few frames of her walking across the screen. The court excluded the video because the danger of confusing the jury was high and its probative value was low. This reasoning is tenable, especially in light of testimony from several family members about the events depicted in the video. The trial court did not abuse its discretion in excluding the video.

### C. Von Heydt's Small Claims Suit

Ebert and Bruers also argue the court should not have excluded evidence that von Heydt filed a small claims action against them in January 2017, days after she withdrew $129,000 from the joint bank account. In the small claims action, von Heydt sought a lump sum of $3,495 for "Property Damage," "Merchandise," and a "Loan" for "Defendants['] Bar & Grill." Ebert and Bruers assert the evidence would have showed that von Heydt knew how to fill out and file legal documents and that von Heydt referred to the money she gave Ebert as a loan rather than an investment. The trial court did not err by excluding the evidence. The time and confusion in explaining how von Heydt arrived at the amount sought in the small claims action, what portion was attributable to TDH, and why she characterized the amount as a "loan" outweighed the low probative value of the evidence.

11

Even so, other evidence showed that von Heydt knew how to fill out legal documents and that she referred to the money she gave Ebert as a "loan." The jury received as exhibits several legal documents signed by von Heydt, including liquor license applications, leases, and the TDH agreement. From these, the jury could deduce von Heydt was competent to sign business documents. And other witnesses testified that von Heydt loaned the money to Ebert. Ebert's son testified that his grandmother told him that she "loaned" his mother money "[t]o get her started." One of Ebert's brothers, Tracy Hatch, said von Heydt told him that "she lent my sister some money . . . to get the bar started." Another brother, Mark Hatch, told the jury his mother told him that she "loaned my sister" money for "the bar."[11]

II. Instructional Error

Ebert and Bruers argue the court erred by giving several improper jury instructions and by failing to give one of their proposed instructions.

"Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and, when read as a whole, properly inform the trier of fact of the applicable law." Helmbreck v. McPhee, 15 Wn. App. 2d 41, 57, 476 P.3d 589 (2020), review denied, 196 Wn.2d 1047 (2021). We review a trial court's instructions for legal error de novo. Id. Absent legal error, we review instructions for an abuse of discretion. Id. We also review a trial court's refusal to give a requested instruction for an abuse of

---

[11] As to the fourth evidentiary allegation, Ebert and Bruers assert the trial court erred by admitting exhibits 59 and 60 "without adequate cause." But they do not support their argument with legal authority so we do not address it. RAP 10.3(a)(b); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

discretion.  Bulzomi v. Dep't of Labor & Indus., 72 Wn. App. 522, 526, 864 P.2d 996 (1994).

A.  Waiver

CR 51 governs jury instructions.  CR 51(f) provides:

Before instructing the jury, the court shall supply counsel with copies of its proposed instructions which shall be numbered. Counsel shall then be afforded an opportunity to make objections to the giving of any instruction and to the refusal to give a requested instruction.  The objector shall state distinctly the matter to which counsel objects and the grounds of counsel's objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made.

This rule enables the trial court to correct any mistakes in the instructions in time to prevent the unnecessary expense of a second trial.  Estate of Ryder v. Kelly-Springfield Tire Co., 91 Wn.2d 111, 114, 587 P.2d 160 (1978).  Failure to object to an instruction in compliance with CR 51(f) generally precludes appellate review of the instruction.  Millies v. LandAmerica Transnation, 185 Wn.2d 302, 310, 372 P.3d 111 (2016).  When no party objects to an instruction below, it becomes the law of the case.  Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 917, 32 P.3d 250 (2001).

Ebert and Bruers assign error to instructions 20 and 25 defining the measure of damages for two of von Heydt's breach of fiduciary duty claims against Ebert.  They also assign error to the court's refusal to give their proposed instruction 7 stating that "[p]arties are generally charged with knowledge of the contents of the documents that they sign, unless there is a legally special relationship" triggering a duty for one party to disclose the contents of a document to the other party.  But Ebert and Bruers did not object to instruction 25

13

or the failure to give instruction 7.  As to instruction 20, Ebert and Bruers argue on appeal that the court should not have permitted the jury to consider as damages von Heydt's "[l]oss of value from selling her condo."  But again, they failed to object to that instruction below.[12]  Ebert and Bruers waived appellate review of these assignments of error.

### B.  Comments on the Evidence

Ebert and Bruers also object to jury instructions 17, 21, and 33 summarizing von Heydt's breach of fiduciary duty and intentional infliction of emotional distress claims.  They argue these "summary of the claims" instructions amount to improper comments on the evidence because they are "argumentatively slanted toward" von Heydt.

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."  WASH. CONST. art. IV, § 16.  An instruction to the jury improperly comments on the evidence if it resolves a disputed issue of fact that the court should have left to the jury.  Wuth ex rel. Kessler v. Labr'y Corp. of Am., 189 Wn. App. 660, 698, 359 P.3d 841 (2015).  But an instruction summarizing a party's claim followed by cautionary language explaining to the jury that the proper use of the instruction is for only clarification of a party's claim is not reversible error.  McLaughlin v. Cooke, 112 Wn.2d 829, 834, 774 P.2d 1171 (1989).

---

[12] Ebert and Bruers did object to the court's failure to define "life expectancy" as used in instruction 20 and they argue on appeal that the court's refusal to define the term was error.  But they provide no authority for their argument.  " 'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.' "  State v. Logan, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000) (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

Here, instructions 17 and 21 cautioned the jury:

You are not to consider the summary as proof of the matters claimed unless admitted by the opposing party; and you are to consider only those matters that are admitted or are established by the evidence. These claims have been outlined solely to aid you in understanding the issues.

And instruction 33 similarly stated:

You are not to consider the summary as proof of the matters claimed; and you are to consider only those matters that are established by the evidence. These claims have been outlined solely to aid you in understanding the issues.

The trial court did not err by instructing the jury in this fashion.[13]

III. Substantial Evidence

Ebert and Bruers argue substantial evidence does not support the jury's verdict as to breach of fiduciary duty, unjust enrichment, fraud, and intentional infliction of emotional distress.[14]

Substantial evidence supports a jury's verdict if the record contains a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the premise. Winbun v. Moore, 143 Wn.2d 206, 213, 18 P.3d 576 (2001). Where reasonable minds could differ on the question, we will not disturb the

---

[13] Ebert and Bruers also challenge instruction 22 defining "fiduciary duty," instruction 23 providing the elements for breach of fiduciary duty, instruction 31 providing the elements for fraud, and instruction 32 explaining the jury's duty to award damages for a finding of fraud. They argue the evidence does not support these instructions. We address those claims in the substantial evidence section.

[14] Ebert and Bruers also assign error to the trial court's denial of their motion for summary judgment. But the "denial of summary judgment cannot be appealed following a trial if the denial was based upon a determination that material facts are in dispute and must be resolved by the trier of fact." Johnson v. Rothstein, 52 Wn. App. 303, 304, 759 P.2d 471 (1988). Because the court denied summary judgment dismissal based on disputed material facts, Ebert and Bruers must appeal from the sufficiency of the evidence presented at trial, not from the denial of summary judgment. Adcox v. Child.'s Orthopedic Hosp. & Med. Ctr., 123 Wn.2d 15, 35 n.9, 864 P.2d 921 (1993).

jury's verdict. See Id. at 217. We do not review the jury's credibility determinations or weigh conflicting evidence. Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009); see also Mills v. Inter Island Tel. Co., 1 Wn. App. 651, 652, 463 P.2d 277 (1969) ("If there is substantial evidence to support the jury's verdict we may not retry the factual issues on appeal."). "Overturning a jury verdict is appropriate only when it is clearly unsupported by substantial evidence." Burnside v. Simpson Paper Co., 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994).

### A. Breach of Fiduciary Duty

Von Heydt asked the jury to find that Ebert owed her a fiduciary duty based on Ebert's role as a "de facto manager" of TDH and because of their "special relationship." The jury awarded von Heydt damages under both theories. Ebert contends substantial evidence supports neither award. We disagree.

A breach of a fiduciary duty imposes liability in tort. Miller v. U.S. Bank of Wash., NA, 72 Wn. App. 416, 426, 865 P.2d 536 (1994). To prevail on a claim of breach of a fiduciary duty, von Heydt had to establish (1) Ebert owed her a duty, (2) Ebert breached that duty, (3) resulting injury, and (4) the claimed breach proximately caused the injury. Id.

#### i. De Facto Manager

In Washington, the manager of an LLC "is an agent of the [LLC] and has the authority to bind the [LLC] with regard to matters in the ordinary course of its activities." RCW 25.15.154(2)(a). Under RCW 25.15.038(1)(a), LLC managers

16

have the fiduciary duties of "loyalty and care" with respect to the company and its members.  The duty of loyalty includes "avoiding secret profits, self-dealing, and conflicts of interest."  Horne v. Aune, 130 Wn. App. 183, 200, 121 P.3d 1227 (2005); RCW 25.15.038(2).  The duty of care includes "refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law in the conduct and winding up of the [LLC]'s activities."  RCW 25.15.038(3)(a).  A manager must also "avoid intentional misconduct and knowing violations of law" and adhere to the "contractual duty of good faith and fair dealing."  RCW 25.15.038(6).

> In her complaint, von Heydt alleged:
>
> Although not officially a Member or Manager of TDH LLC, Ebert has in fact exercised full control over TDH LLC from the time of its formation to the present.  As the de facto Manager of TDH LLC, Ebert owed fiduciary duties to plaintiff because plaintiff was a Member of TDH LLC.

The court permitted von Heydt to argue this LLC de facto manager theory by instructing the jury that it could consider whether Ebert owed von Heydt a fiduciary duty "based on Ebert's control and management of TDH, LLC."

Ebert does not challenge the legal basis for von Heydt's theory of de facto liability on appeal.[15]  Instead, she argues for the first time that von Heydt had no "standing to raise claims" against Ebert personally based on losses incurred by TDH.  We considered whether a challenge to standing may be raised for the first time on appeal in In re Estate of Reugh, 10 Wn. App. 2d 20, 51-57, 447 P.3d 544

---

[15] Ebert argued below that she sees "no authority that says that a person who allegedly controls an LLC becomes its effective manager and then . . . has a fiduciary duty — a broad fiduciary duty, much more than the statute, to do all those things."  But nowhere in her 302 pages of briefing on appeal does she challenge the de facto manager theory.

(2019). We concluded that "in Washington, a plaintiff's lack of standing is not a matter of subject matter jurisdiction." Id. at 57. As such, a party waives a challenge to standing on appeal if they do not raise it in the trial court. See Id. at 53-54. Because Ebert did not adequately raise her challenge to von Heydt's standing on this claim below, we decline to consider it.

Ebert also argues that substantial evidence does not support the jury's findings that she exercised control over the LLC such that she became its de facto manager and subsequently breached a duty of loyalty. But the jury heard testimony about various ways in which Ebert controlled TDH. Ebert hired an attorney to draft the LLC agreements and complete the liquor license applications on behalf of TDH. She drafted the lease addendums for the building and the agreements to lease equipment. Ebert also testified that von Heydt was "on the liquor license because I put her there." And Ebert signed the signature cards for the TDH business accounts. She even orchestrated the Memorandum of Gift conveying von Heydt's shares of the LLC to Bruers. Von Heydt testified that Ebert "handled everything" and "took care of everything" for the business. Ebert agreed she was "kind of in control of both sides of the transaction rights" in setting the terms under which TDH leased the building space from MRAE because TDH "was always my company." Substantial evidence supports the jury's determination that Ebert was a de facto manager of TDH.

Substantial evidence also showed that Ebert breached her duty of loyalty to "refrain from dealing with the [LLC] as or on behalf of a party having an interest adverse to the [LLC]." RCW 25.15.038(2)(b). The jury heard testimony that

Ebert rendered TDH unprofitable by (1) increasing its monthly rent to MRAE by thousands of dollars the first year despite having a five-year lease agreement specifying a lower rate, (2) not dividing the cost for promotional losses like happy hour discounts equally between TDH and Kittens, and (3) charging TDH high rates to lease equipment. Though Ebert profited from these decisions as the owner of MRAE, KCAB, and Ebert Leasing, von Heydt neither recouped her investment nor received any of the hidden profits from TDH.

> ii. Special Relationship

Von Heydt also sought recovery under the theory that Ebert owed her a fiduciary duty by virtue of their special relationship.

A fiduciary relationship arises as a matter of law in certain relationships, including attorney and client, doctor and patient, and trustee and beneficiary. Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP, 110 Wn. App. 412, 434, 40 P.3d 1206 (2002). But a fiduciary relationship may also arise in fact regardless of the relationship between the parties in law. Id. A fiduciary relationship may arise in fact when there is

> "something in the particular circumstances which approximates a business agency, a professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which [s]he otherwise should, and ordinarily would, exercise."

Alexander v. Sanford, 181 Wn. App. 135, 173, 325 P.3d 341 (2014)[16] (quoting Hood v. Cline, 35 Wn.2d 192, 200, 212 P.2d 110 (1949)). In other words, a special relationship arises when one party " 'occupies such a relation to the other

---

[16] Internal quotation marks omitted.

party as to justify the latter in expecting that h[er] interests will be cared for.' " Liebergesell v. Evans, 93 Wn.2d 881, 889-90, 613 P.2d 1170 (1980) (quoting RESTATEMENT OF CONTRACTS § 472(1)(c) (AM. LAW INST. 1932)). Whether one party reasonably relied on the other party's representations is normally a question of fact for the jury. See Hawkins v. Empres Healthcare Mgmt., LLC, 193 Wn. App. 84, 100, 371 P.3d 84 (2016).

Ebert argues von Heydt's trial testimony "provided no foundation for her belief that [Ebert] was acting in furtherance of the interests of [von Heydt], rather than acting on [Ebert]'s own behalf." But von Heydt testified that she "trusted [her] daughter," that she believed Ebert "wouldn't go and be cheating me or skimping on me," and that Ebert promised she "was going to take care of me." When given LLC related papers to sign, von Heydt did so without question. As she put it, "I had no reason not to [sign]" because "I thought my daughter was looking out for me." David testified that von Heydt "idolized" Ebert and would do whatever she wanted. He described von Heydt as "dependent" on Ebert. And as a retiree, von Heydt had removed herself from the world of business, while Ebert was a sophisticated owner and operator of several businesses and properties.

Ebert suggests that even if von Heydt once depended on her, their relationship had deteriorated so much that by the time she presented von Heydt with the Memorandum of Gift, it was not reasonable for von Heydt to believe Ebert was still acting for von Heydt's benefit. But von Heydt testified she did not "ever imagine that [Ebert] would break her promises." David also testified von

20

Heydt relied on Ebert's promises. And Ebert's brother Stacy[17] told the jury unequivocally, "My mom trusts my sister, period." Even at the time of trial, von Heydt still felt "I had no reason not to trust my daughter. She's always been good to me . . . . And I just can't believe this." The evidence supports the jury's verdict that Ebert owed von Heydt a fiduciary duty based on their special relationship.

### B. Unjust Enrichment

Ebert and Bruers contend the jury erred by awarding damages for von Heydt's unjust enrichment claim beyond the amount spent to benefit TDH. We disagree.

For the doctrine of unjust enrichment to apply, a plaintiff must detrimentally confer some benefit on another such that denying recovery would be unfair. Molander v. Raugust-Mathwig, Inc., 44 Wn. App. 53, 61, 722 P.2d 103 (1986). "Enrichment alone will not trigger the doctrine; the enrichment must be unjust under the circumstances and as between the two parties to the transaction." Dragt v. Dragt/DeTray, LLC, 139 Wn. App. 560, 576, 161 P.3d 473 (2007). To show unjust enrichment, von Heydt had to prove (1) Ebert and Bruers received a benefit, (2) the received benefit was at von Heydt's expense, and (3) the circumstances made it unjust for Ebert and Bruers to retain the benefit without payment. Young v. Young, 164 Wn.2d 477, 484-85, 191 P.3d 1258 (2008). The jury determines these questions of fact, including the amount of damages to award. James v. Robeck, 79 Wn.2d 864, 869, 490 P.2d 878 (1971).

---

[17] We refer to Stacy Hatch by his first name for clarity and intend no disrespect by doing so.

We strongly presume the jury's verdict is correct. Sofie v. Fibreboard Corp., 112 Wn.2d 636, 654, 771 P.2d 711, 780 P.2d 260 (1989). We will reverse a jury award of damages only when it is outside the range of substantial evidence in the record. Washburn v. Beatt Equip. Co., 120 Wn.2d 246, 268, 840 P.2d 860 (1992).

Here, von Heydt had to show that it would be unjust for Ebert and Bruers to keep proceeds from TDH, the sale of the tiny house, and von Heydt's unreturned financial investment. To do so, she offered evidence of Ebert and Bruers' gains and her losses, including the relative starting and ending financial positions of each. And to show damages, von Heydt estimated her losses using financial data, including tax records, leasing agreements, and business profit and loss statements. This evidence supported von Heydt's unjust enrichment claim.

Ebert and Bruers argue the only benefit they could have received at von Heydt's expense was the amount they spent from the money von Heydt provided for TDH. But Ebert and Bruers also received profits from TDH at von Heydt's expense. And the evidence showed von Heydt contributed $26,300 to purchase the tiny house but did not share in the profits after Ebert and Bruers sold it. Substantial evidence supports the jury's verdict on this claim.

### C. Fraud

The jury found Ebert committed fraud by promising von Heydt she would own TDH "for as long as it continued to operate," receive its profits, and have a free place to live on Ebert's property "for the rest of [her] life." The jury also found Ebert and Bruers committed fraud by representing that the Memorandum

of Gift transferring all of von Heydt's interest in TDH to Bruers "was insignificant." Ebert and Bruers contend no evidence shows they obtained money from von Heydt by fraud. Ebert argues that the jury heard no evidence of "promises" she made to von Heydt or of her "contemporaneous intent" not to perform. Ebert also claims von Heydt presented the jury with no evidence that her reliance on any such promises by Ebert was reasonable.

The elements of fraud are:

(1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his [or her] intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) [her] right to rely upon it; [and] (9) [her] consequent damage.

Kirkham v. Smith, 106 Wn. App. 177, 183, 23 P.3d 10 (2001). Intent is a factual determination. State v. Konop, 62 Wn.2d 715, 718, 384 P.2d 385 (1963). "Whether one intended, at a specified time, to defraud another of his property is a question of fact to be resolved by the trier of the facts." Id. A plaintiff must prove fraud by clear and convincing evidence. Bang D. Nguyen v. Dep't of Health Med. Quality Assur. Comm'n, 144 Wn.2d 516, 527, 29 P.3d 689 (2001).

Substantial evidence supports the jury's findings that Ebert promised von Heydt she would be an owner of TDH and receive its future profits. Von Heydt testified that Ebert told her she would own 90 percent of TDH and would have "money to spend anyway you want." David corroborated von Heydt's testimony, stating Ebert told him that von Heydt was selling her condo so she could be a partner in TDH and that TDH "was owned by her mother and [it] was for her

23

mother's livelihood and future." And Sonya Vasquez, a CPA working for Kittens and TDH, testified that as late as May 2016, Ebert told her von Heydt owned 90 percent of TDH and Bruers owned the remaining 10 percent.

Substantial evidence also supports the jury's finding that Ebert never intended for von Heydt to own the bar and receive its profits. Ebert repeatedly asserted that TDH was "always my bar" and that TDH "was never actually my mom's bar. She was holding the bar for me." She testified that "I was going to get my bar back" and remove von Heydt from the LLC once she repaid von Heydt, stating her mother's role "was [to] hold title over the liquor license and the business license to [TDH] until I had my mom paid off." Ebert told the jury TDH was to be in von Heydt's name for only "some indefinite period until [Ebert] decided otherwise." Barton and Anthony Crawford, a commercial kitchen equipment specialist hired by Ebert, corroborated the testimony. Barton testified that von Heydt was "never intended to be [ ] involved in the day-to-day operations" of TDH. Crawford told the jury that Ebert managed TDH and told him it was her bar.

Finally, the jury heard substantial evidence from which it could determine that von Heydt reasonably relied on Ebert's promises. Ebert and von Heydt had a close relationship for many years. Von Heydt relied on Ebert for financial advice and "had no reason not to trust my daughter." And the business plan proposed by Ebert appeared to benefit both Ebert and von Heydt—Ebert would profit through the property and equipment leases as well as increased customer

24

traffic to Kittens while Von Heydt would profit from TDH proceeds.  Substantial evidence supports the jury's verdict of fraud as to Ebert.

Ebert and Bruers also argue that substantial evidence does not support the jury's verdict that they fraudulently induced von Heydt to sign the Memorandum of Gift that transferred her share of TDH to Bruers.  Von Heydt concedes that the verdict against Bruers "should not stand."  We accept von Heydt's concession and remand for the trial court to vacate the finding of fraud as to Bruers.[18]

### D.  Intentional Infliction of Emotional Distress

Ebert and Bruers argue substantial evidence does not support von Heydt's intentional infliction of emotional distress claim because she did not show they engaged in extreme and outrageous conduct causing her severe emotional distress.  Again, we disagree.

To prevail on her claim for intentional infliction of emotional distress, von Heydt had to prove (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) the actual result of severe emotional distress.  Lyons v. U.S. Bank Nat'l Ass'n, 181 Wn.2d 775, 792, 336 P.3d 1142 (2014).  "The first element requires proof that the conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' "  Robel v. Roundup Corp., 148 Wn.2d 35, 51, 59 P.3d 611

---

[18] Because substantial evidence otherwise supports the jury's verdict of fraud as to Ebert, we need not address her challenge to von Heydt's alternate theory.

(2002)[19] (quoting Dicomes v. State, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989)).

Mere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities do not impose liability.  Spicer v. Patnode, 9 Wn. App. 2d 283, 296, 443

P.3d 801 (2019).  But where reasonable minds can differ as to whether the

conduct rises to an outrageous level, the jury is entitled to determine the issue.

Robel, 148 Wn.2d at 51.

Here, the jury heard evidence that Ebert and Bruers caused von Heydt to

live without working water, heat, or septic for two weeks, forcing her to buy

gallons of water for drinking and bathing and to defecate in plastic bags.  Ebert

and Bruers sometimes locked von Heydt out of the big house altogether.

Aggressive behavior, threats, and obscenities followed.  Von Heydt testified that

one time, Ebert told her, "I hate you, mom; I hope you die."  Von Heydt testified

that she awoke to Ebert and Bruers outside her window, shining lights into her

bedroom.  And once, Ebert approached von Heydt in a menacing manner,

"threw" down a car payment coupon book on a table, and yelled, "[M]ake your

own f[uck]ing car payments."  Von Heydt described the entire experience as a

"nightmare."

Ebert's brother Stacy, who stayed with von Heydt just before she moved

out of the big house, corroborated von Heydt's testimony.  He heard Ebert yell to

von Heydt, "I wish you were dead, you fucking c[*]nt."  He said it was like living

"in hell" and described Ebert and Bruers' conduct as "punishment" and

"intentionally cruel."  He saw von Heydt "crying" and "freaking out."  From this

---

[19] Emphasis omitted; internal quotation marks omitted.

evidence, the jury could reasonably determine that Ebert and Bruers' actions were outrageous and caused von Heydt severe emotional distress.

IV.  Postverdict Motion

Ebert and Bruers argue the trial court erred by denying their postverdict motion for JNV, remittitur, and, in the alternative, a new trial.  We disagree.

A.  Judgment Notwithstanding the Verdict

We review a trial court's denial of a motion for JNV de novo, engaging in the same inquiry as the trial court.  Schmidt v. Coogan, 162 Wn.2d 488, 491, 173 P.3d 273 (2007).

> Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.

Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816 (1997).  A motion for JNV admits the truth of the opponent's evidence and all inferences reasonably drawn from it.  Alum. Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 529, 998 P.2d 856 (2000) (citing Davis v. Early Constr. Co., 63 Wn.2d 252, 254-55, 386 P.2d 958 (1963)).

We cannot say that as a matter of law, there is no substantial evidence to support the jury's verdict.  Because von Heydt presented sufficient evidence to convince an "unprejudiced, thinking mind" of each of her claims, the trial court did not err in denying Ebert and Bruers' motion for JNV.  Grange v. Finlay, 58 Wn.2d 528, 529, 364 P.2d 234 (1961).

B. Remittitur

Ebert and Bruers also argue the court erred in not reducing "the $150,000 in damages on the outrage claim and the damages for other breaches found by the jury."

We review the trial court's decision denying remittitur for abuse of discretion. Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 176, 116 P.3d 381 (2005).[20] A trial court should grant remittitur if it finds the jury's damage award "so excessive" that it "unmistakably" resulted from "passion or prejudice." RCW 4.76.030.

A jury's verdict is excessive when it is " 'outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.' " Bunch, 155 Wn.2d at 175 (quoting Bingaman v. Grays Harbor Cmty. Hosp., 103 Wn.2d 831, 835, 699 P.2d 1230 (1985)). To determine whether the jury's verdict shocks the conscience, we ask if the award is "flagrantly outrageous and extravagant." Bingaman, 103 Wn.2d at 836-37. Passion and prejudice must be "unmistakable" for us to conclude it affected the jury's award. Id. at 836; RCW 4.76.030.

Ebert and Bruers argue the jury awarded von Heydt excessive damages because evidence showing the disparity of wealth between the parties improperly appealed to the juror's sympathy. But Ebert and Bruers introduced much of the evidence about which they now complain. Ebert's real estate expert told the jury that her 4th Avenue South building was worth $6.4 million. And another defense

---

[20] The de novo statutory standard of review applies only when the trial court actually remits an award. Bunch, 155 Wn.2d at 176; RCW 4.76.030.

witness testified that von Heydt's new condominium was worth $191,000 at the time of trial.

In any event, the record shows that the jury carefully considered its award of damages. Von Heydt's CPA estimated her total loss to be $2,256,033. But the jury awarded $764,453 in damages, about one third of the amount von Heydt sought. The jury reduced its award to avoid duplicative damages. And while the jury found Ebert breached her contract with von Heydt, it did not award any damages for that claim. We cannot say the jury award was "so excessive as to be 'flagrantly outrageous and extravagant,' particularly in light of the strong presumption we accord to jury verdicts." Bunch, 155 Wn.2d at 182. And Ebert and Bruers fail to show that the jury arrived at its award by "unmistakable" passion or prejudice. RCW 4.76.030. The trial court did not err in denying their motion for remittitur.[21]

V. Attorney Fees

In her cross appeal, von Heydt argues that the trial court erred by refusing to award her attorney fees. She contends Ebert's breach of fiduciary duty created an equitable basis for an award of fees.

A court may award attorney fees when authorized by a contract, statute, or a recognized ground in equity. Greenbank Beach & Boat Club, Inc. v. Bunney, 168 Wn. App. 517, 524, 280 P.3d 1133 (2012) (citing Hsu Ying Li v. Tang, 87

---

[21] In the alternative, Ebert and Bruers moved for a new trial under CR 59, arguing the same grounds as those warranting JNV and remittitur. They cite CR 59(a)(1) (irregularity in the proceedings or abuse of discretion), (5) (excessive damages indicate verdict result of jury's passion or prejudice), (7) (insufficient evidence justifies verdict or verdict contrary to law), and (9) (substantial justice not done) in support of their argument. They also claim cumulative error warrants a new trial. Because the verdict was not excessive and the trial court committed no error, we reject these claims.

Wn.2d 796, 797-98, 557 P.2d 342 (1976)).  We review a trial court's decision denying attorney fees for an abuse of discretion.  In re Recall of Pearsall-Stipek, 136 Wn.2d 255, 265, 961 P.2d 343 (1998); Baker v. Fireman's Fund Ins. Co., 5 Wn. App. 2d 604, 613, 428 P.3d 155 (2018).

Citing Tang, von Heydt contends the court should have awarded her fees using its equitable powers.  In that case, one partner of an apartment management business sued Tang, the only other partner, to dissolve their partnership.  Tang, 87 Wn.2d at 797.  The trial court determined that Tang was negligent in failing to keep books, provide accountings, and keep partnership funds separate from his own.  Id.  The court awarded attorney fees to the petitioner.  Id.  Our Supreme Court affirmed the award as an exercise of the trial court's " 'inherent equitable powers.' "  Id. at 799 (quoting Weiss v. Bruno, 83 Wn.2d 911, 914, 523 P.2d 915 (1974)).  It reasoned that under "the facts and circumstances of this case, we believe it is appropriate to award petitioner fees" because Tang breached his fiduciary duty to the partnership in a manner that amounted to constructive fraud.  Id. at 799-800.

Subsequent cases narrowed Tang to situations when the prevailing party preserved an identifiable fund in the form of partnership assets or the defendant's conduct amounted to bad faith, such as constructive fraud.  See ASARCO Inc. v. Air Quality Coal., 92 Wn.2d 685, 716, 601 P.2d 501 (1979); Perez v. Pappas, 98 Wn.2d 835, 844-45, 659 P.2d 475 (1983); Green v. McAllister, 103 Wn. App. 452, 467-69, 14 P.3d 795 (2000).  In any event, any equitable award of attorney fees is left to the sound discretion of the trial court, "[e]specially when the plaintiff

is suing to recover for h[er]self alone." McAllister, 103 Wn. App. at 468; see also Kelly v. Foster, 62 Wn. App. 150, 155, 813 P.2d 598 (1991) (a fiduciary's breach does not mandate an award of fees).

Here, the trial court heard weeks of testimony. After careful consideration, it determined that the facts did not warrant an award of fees. The decision did not amount to an abuse of discretion.[22]

We remand for the trial court to vacate its judgment against Bruers on the fraud claim. We otherwise affirm.

_Brunner, J._

WE CONCUR:

_Andrus, C.J._        _Dwyer, J._

---

[22] Von Heydt also asks us to award her attorney fees on appeal under the theory that the prevailing party may recover fees on appeal where the trial court erred by not awarding them below. See RAP 18.1(a). Because the trial court did not err in refusing to award fees below, we deny von Heydt's request for attorney fees on appeal.